Welcome to the 4th District Appellate Court Oral Arguments today. I want to thank the University of Illinois at Springfield, Chancellor Cook, and Professor Borland who did a lot of work in getting this set up. We're very excited to be here at the university. We've tried to go to one university in the spring and we go to the University of Illinois Law School in the fall and hold oral arguments on real cases. This is not a moot court competition this morning. These are real cases with real lawyers and real litigants. I want to thank the attorneys who agreed to come out here today and have their oral arguments heard at UIS. It is a little inconvenient for them but we appreciate it. We think it's a really good learning experience for the students. I'm Carol Pope. I happen to be the presiding justice in the 4th District Appellate Court this year. To my left is Justice Thomas Appleton and to my right is Justice John Turner who will be hearing the oral arguments with me in this case today. I heard the clerk explaining a lot of the details about what's going on and that will save me from having to do it and so I think we're ready to begin. So I will call the roll. People of the State of Illinois v. Jeremy Cooper. Attorney Wilson is here on behalf of the appellant and Attorney McNeil is here on behalf of the state, the appellee. Alright. Mr. Wilson are you ready to proceed? Alright, great. May it please the Court. Counsel. Good morning Your Honors. My name is Ryan Wilson. I'd like to present Jeremy Cooper on behalf of the Office of the State Appellate Defender. Mr. Cooper chose to represent himself in this case. He was entitled to a fair trial in front of an unbiased judge. But that isn't what he received. Instead, the Court, in conduct that it even described as highly unusual, interrupted Jeremy's examination of witnesses approximately 37 times. Many of those times were sua sponte objections that there was no indication the state even wanted to make. The Court also refused to allow Jeremy to question several defense witnesses during a series of critical offers of proof. Instead, the Court, which was largely uninformed about the defense witnesses' involvement in the case, questioned the witnesses. It instructed Jeremy not to interrupt it and on the one occasion when he did, to clarify some testimony, the Court told him if he interrupted again, he would be placed in jail and he would not have the opportunity to cross-examine the state's witnesses during the entirety of the trial. The Court's conduct was not only highly unusual. Does the trial court have authority to issue that kind of a rule? In limited circumstances, I would say it does. In this case, though, where there was a wholesale failure to allow him to question any witnesses during the offer of proof, I would say the Court overstepped its bounds here. This isn't a case where, up until that point, Jeremy had been abusive to witnesses or been disrespectful to the Court. He had gone so far as, in one case, to even try and understand the hearsay doctrine and when he believed that one of his witnesses might not have a report might be excluded on hearsay grounds, he found an exception to the hearsay rule. Jeremy was as prepared as an attorney probably would have been to represent him in this case. The fact that he represented himself pro se doesn't give him any different rights or any fewer rights than counsel would have had. In this case, had counsel represented Jeremy, that attorney would have been able to examine those witnesses during the offer of proof, especially in a case like this where the evidence reflects that Jeremy had reviewed the reports that these witnesses had written, he knew their involvement in the alleged assault, and he understood the prison policies and procedures that applied after an assault like this. There's no evidence in the record that the judge understood these things. She may have had a very basic knowledge of it based on the testimony that was proffered prior to those witnesses being called for the offer of proof, but there was no indication that she had the in-depth knowledge that was necessary in order to properly question those witnesses so the Court could fully understand what their testimony was going to be. Prior to the Court asking that these witnesses come in to testify, it again instructed Jeremy that he wasn't to ask any questions, not to interrupt the Court. What's important about that is the Court also said, in a majority of cases, I believe three out of the four offers of proof, the Court told Jeremy, I'll give you an opportunity to ask questions when I'm ready. Out of the four witnesses that the Court questioned, the Court allowed Jeremy to ask one question of the Court, which had to be conveyed to the judge, and then the judge could convey it to the witness. So for most purposes, he was completely excluded from questioning these witnesses and demonstrating that the testimony that they could offer, the testimony that he was aware of, could help his case. Instead, the judge was the one that made that decision, a judge who didn't understand the full ramifications and full merit of what that testimony would have been. Now, you started out, counsel, by mentioning the judge made a statement to him that if he interrupted her, he'd go to jail or something. Yes, Your Honor. Was that during the in limine hearing, outside of the presence of the jury, or in front of the jury? It was. It was outside of the presence of the jury in the in limine hearing. The judge's conduct and the judge's demeanor towards Jeremy, though, wasn't that different in front of the jury. During one witness examination, and I hope I'm pronouncing the name correctly, Nurse Kijelovic had authored, she was a witness, alleged witness to this act, and she had given a narrative statement to another officer, apparently, at the prison. She had signed that statement. And that statement was, in some ways, inconsistent with the testimony that she offered at trial. And Jeremy wanted to examine her based on that statement to show the inconsistencies that were present between her trial testimony and the statement that she had signed. As Jeremy was getting ready to try and examine her with that report, though, the court said, oh, that's hearsay. It's not coming in. Jeremy said, I've got an exception here. Can we please hear this? I want to show you that there's an exception to the hearsay rule. The court said no. Jeremy said, would you please excuse the jury so we can have a hearing on this so I can explain to you why your testimony is relevant and why there's a hearsay exception. And the judge says, no, I'm not going to excuse the jury. Jeremy said, I still want to ask my question. And the judge said, OK, take the jury out. Take him out, too. The judge said that in the jury's presence. Her frustration was on display for the jury. Now, the judge ultimately allowed Jeremy to stay in the courtroom during that recess, but she ordered that he be handcuffed. There hadn't been any indication up to that point that he was acting aggressively or that he was a danger to anyone or an escape risk. The handcuffing seems very punitive in this case because she was upset with Jeremy. Did they remain on for the rest of the trial? They did not. Before the jury came back in, the judge had the handcuffs removed. All right. So then while the jury was present, he was not handcuffed. That's correct. But still, the judge's frustration was still on display in front of the jury. It just wasn't the offer of proof where the judge was visibly frustrated with him. And I should add that throughout this trial, again, by my count, the judge interrupted Jeremy's set forth in the brief, and it's not entirely clear, but during many of those interruptions, the judge made several objections to the testimony. The judge would say, objection that's speculative and hearsay, or that's irrelevant and asked unanswered. But as you go through trial, and I believe the law is fairly clear on this, that juries are quick to pick up on the leanings of a court. And if a court seems frustrated, if a court doesn't believe that a defendant's case has merit, those are things the jury picks up on. And so as we're going through trial, or as they were going through trial, and as the judge was making all these objections, sometimes objections that went on for pages, it would have been hard for the jury not to pick up on the court's frustration with Jeremy. It's very similar to the Lorenz case that's And during his case, he would make objections. And I guess you would call them speaking objections. And the court would say, counsel, stop making speeches. And there were approximately 16 of those. And the court found that the judge's phraseology, the fact that the judge was calling defense counsel's objections speeches, indicated to the jury that the points that defense counsel was trying to make, the objections that he was making, the points of law he was trying to make, weren't important and that they could be disregarded. The state in its brief tries to distinguish Lorenz and says, this is an entirely different case here. But I don't believe it is. It's a case where, regardless of what the actual words the judge used were, the judge didn't call any of Jeremy's statement speeches. But what the judge did throughout trial was certainly give the jury the idea that what Jeremy was talking about, this testimony that he was trying to elaborate on, and the questions that he was posing to the witnesses, was irrelevant. In fact, the court would say that. During one exchange, Jeremy asked Officer Punky some questions regarding a uniform that was present there in court. Jeremy's defense was that he was essentially being framed, that he was assaulted by prison guards at the prison, and therefore they had to make up some reason to come into his cell and remove him from the cell, thereby causing the battery that he alleged. And his argument was that they made up this allegation that he had thrown a substance on Officer Punky. However, the uniform present at trial didn't appear to be damaged, didn't appear to be stained, anything of that nature. Jeremy also knew that Officer Punky, in his written report, didn't say anything about submitting his uniform to officers at the prison to begin the investigation. Jeremy decided he wanted to make a point. Either Punky's report was poorly written because he didn't acknowledge that he had turned evidence over to the prison, or the uniform present in the courtroom actually wasn't his, because it wasn't reflected in his report. Jeremy started asking Punky these questions, and the court asked him to explain the relevance of his line of questioning. Jeremy said, I'm trying to prove that's not his uniform. That uniform is not damaged. He's framing me. In his report, he never says he put no uniform and no bag or nothing. The court responded, the question is stricken. The jury should disregard everything the defendant just said because it's all argument and it's not before the court. Now, had the judge ended there, there wouldn't necessarily be anything wrong with that statement. The judge is asking the jury to disregard what Jeremy has just said and the point that he's trying to make. But the court added, and there's no evidence to that effect. In saying that, the judge told the jury, there's no evidence that Punky didn't mention failing to submit his uniform in his written report. There's no evidence that that's not his uniform. There's no evidence that anything the defendant just said is true, and that's something that the court's not allowed to do. But as the court said in People v. Tyner, rarely, if ever, is a judge called upon to comment on the evidence during trial except where necessary in ruling on invisibility. Under no circumstance should he express an opinion as to the veracity of evidence. Such an intimation may carry great weight that may prove controlling. And that's certainly what seems to have happened here. The court routinely stepped out of its role as a... Why does any of this amount to plain error? Because it's a structural error. And in cases involving structural error, harmlessness isn't an issue. This case, in its purest form, involves Jeremy not being... Can you be a little more definitive on how it is a structural error? Sure. At this level, Jeremy is alleging that, one, he wasn't allowed to fully represent himself pro se, which is a right that he has. That's a right that the courts have recognized, and the courts have said that when a defendant is denied an opportunity to represent himself pro se, that amounts to a structural error. Additionally, there are several instances throughout here, many of which I've already talked about, where the court is exhibiting bias. And a biased judge or a biased court is another example of where the courts have found that there is structural error. And so the error in this case isn't subject to the harmlessness rules. In fact, it would be very difficult to prove that it wasn't harmless if structural error wasn't present. It's one of these arguments as though none of this is really Jeremy's fault. The court stepped in and the court directed what questions he could ask and what questions he couldn't ask. The court directed what witnesses could testify during the offers of proof and what witnesses could not testify during the offers of proof. The fact that those witnesses were excluded means that we don't have a lot of the information in the record showing what those witnesses would have testified about and what they would have said. And so it's naturally difficult to show that the error was harmless in this case, because the court excluded the very evidence that could show that the error was prejudicial. So we rely on the structural error argument and the exception to the harmlessness test that structural error allows us. The state has argued in its brief that these issues weren't preserved, and therefore they've been procedurally defaulted, because they weren't raised in a post-trial motion. Throughout trial, Jeremy had been clear that he was dismayed by the court's conduct. And I say dismayed, I think it's an accurate word. Several times throughout trial, he would ask the court, Your Honor, can I ask what we're doing? And the court would say, No, you can't. No. Could you please explain why we're doing this? No. And he would say, You know what? I don't understand the process that we're using here. Why are we doing this? And at one point he said, I guess I'll just have to appeal. That's going to be what happens here. And that's exactly why we're here today. But the state has alleged that these issues have been waived. A problem with that argument is we're talking about the court's conduct here. And there's an exception to the waiver argument where the legal issue that is being debated surrounds or involves the court's rulings, the court's comments at trial. In this case, once the jury left the courtroom for deliberations, the judge informed the parties that it wanted to go on the record and explain some of Mr. Cooper's concerns that he had voiced that he wasn't receiving a fair trial. And the court said, essentially, that it had no second thoughts about the way it conducted trial. It believed that it needed to save the state from looking bad in the jurors' eyes. And therefore, it, rather than the state, had to make the objections that it made. The effect, though, was the opposite of that. When jurors walk into a courtroom, they understand that there's going to be an adversarial process. They understand that the state's going to advocate for one position, and the defense is going to advocate for another. What happened in this case, though, is that Jeremy faced both the state and the court. And with the amount of deference that juries offer to statements that the court makes and leanings of the court, the court's involvement in this case was highly prejudicial. And based on the statements that the court made when the jury left to deliberate, there's no indication in this record that the court would have changed its mind had Jeremy filed a post-trial motion alleging that the court acted improperly here. In fact, based on the court's statements, it seems that had he filed one, the court may have even become more upset with him, thinking that he was trying to frustrate the trial process further or delay the case. The state also argues that if what happened in this case is error, if the judge's repeated interjections in the trial were error, and the objections that the court posed were error, this would mean that a defendant could ask many irrelevant questions during trial, requiring the court to step in, and then when the court stepped in on appeal, he would be able to argue that he was denied a fair trial because the court interjected itself into the proceedings. I believe I call it the parade of horribles in the reply brief. And there's simply no merit to that argument, and this is why. In a case such as this, the judge had many options. The judge was concerned about Jeremy representing himself, per se, from the moment that Jeremy expressed a desire to do that. The court said that she didn't think it was a good idea for him to do it, and during trial even said, I told you prior to trial this wasn't a good idea. Now you've gone and done it. But all trial judges try to convince people not to represent themselves. Yes, and that's absolutely true. And the law says that there's no problem with that. But what the judge can't do, regardless of whether the judge believes that that's a wise thing to do or if it's the completely wrong decision for the defendant, is the judge can't keep stepping in and doing the state's job for it. And here that's what the court did. The court had other options. If the court was truly concerned about Jeremy and his ability to represent himself at trial, the court could have appointed standby counsel for Jeremy. In that case, and in the cases involving standby counsel, Ellison being one, the court says that standby counsel can be appointed as long as the defendant still gets to direct his trial. So his rights could have been preserved by standby counsel, who could have properly advised him on what questions to ask and how to ask those questions. The court also could have taken recesses where it would direct Jeremy or instruct him, give him some guidance on what questions the court found acceptable and what questions the court didn't find acceptable. At its purest form, the court just could have let the state pose its own objections. And the court could have ruled on those. That is the way the trial process is supposed to work. Had that happened, we wouldn't be here today. Because it would, at least as to the court's objections, we wouldn't be here today. We might still be here for the offer of proof issue. But that's the way the trial process is supposed to work, and that's not the way it worked in this case. As I said, the court, on 37 occasions at least, interrupted Jeremy's questioning of witnesses. And I said it out in the brief. I'd just like to read a portion of some of the exchange between Jeremy and the court, if I may. Jeremy was cross-examining Officer Todd Punky, who alleged that Jeremy had thrown a substance on him. Jeremy asked, how did your undershirt get damaged if it was under your shirt? Reasonable question. The judge says, calls for speculation. Ask another question. Jeremy said, that is a question. Ask another question, Mr. Cooper. So you're saying Nurse Stephanie, what did she do? He can't testify to what Nurse Stephanie did. What was he treated for? Another question by Mr. Cooper. That's already been asked and answered. The state asked him. I didn't ask him. You don't get to ask him if it's already been asked and answered. Cooper asked Officer Punky, your eye was flushed. The court says, ask and answer. Cooper said, what did Dr. Tilden do? The court says, that's hearsay, Mr. Cooper. Ask another question. Jeremy asked, how were you treated by Dr. Tilden? That's irrelevant. Ask another question. Then he goes on to get some guidance from the court regarding how that's not relevant. Nowhere in that nearly a page of my brief did the state interpose an objection. That was the court on multiple occasions posing objections in the jury's presence telling Jeremy that the questions he was asking were speculative and weren't relevant. And I should note, the state, during its examination of Punky, was able to ask him about the medical treatment that he had received. And this is just an example of how things didn't work both ways at Jeremy's trial. The state was allowed to ask Punky about the medical treatment he received. Jeremy then asked Punky, what did Dr. Tilden do? One of the doctors that Jeremy thought treated Officer Punky. The court responded, that's hearsay, and you can't ask that. He's not asking, what did Dr. Tilden say? He's asking, what did Dr. Tilden do? A question that is relevant, and I should note, later when Jeremy asked, how were you treated by Dr. Tilden? The court said, that's asked and answered. Dr. Tilden's name hadn't been mentioned during witness examination up until that point. It hadn't. So that was a valid question as well. And that may very well have been the reason that the state didn't make an objection to that question because the state knew that no one had discussed Dr. Tilden's treatment of Officer Punky or alleged treatment of Officer Punky up until that point. This is just an example of the pervasiveness of the court's questioning and the way that the court overstepped its duty as a neutral party during Mr. Cooper's trial. So I see my time has expired. We would ask that Jeremy Cooper's conviction be reversed and his case be remanded for a new trial. Thank you, Your Honors. Thank you, Counsel. Mr. McNeil, you have time on rebuttals, Counsel. Thank you. Thank you. Please, the Court. Counsel. It's important to remember that these are two different arguments, two separate arguments. The first argument is posited as denial of defendant's right of self-representation, specifically in the motion in limine hearing or the offer of proof hearing. There, of course, it's well settled that the trial court has vast discretion in how to conduct its motion in limine hearing. It had already heard the proffer from the state that they had talked to all 10 of these subpoenaed witnesses, defendant's subpoenaed witnesses, and that all 10 of them had nothing to offer in support of defendant's theory of being framed or... Sorry, I'm a little bit under the weather, so I will be coughing. Sorry about that. But anyway, about the offer of proof, the all 10 witnesses had nothing to offer. The state proffered that to the trial court. People v. Owen, as I cited in my brief, along with saying that the trial court has vast discretion in conducting its motion in limine hearing, it also explains that it doesn't require live testimony. It doesn't require witnesses at all. They have vast discretion not only in how they conduct the hearing, but also in what evidentiary requirements are required in those hearings. It says the offer of proof can consist either of live testimony or of counsel's representations, as long as the counsel's representations are sufficiently credible and reliable. In other words, the trial court could have just taken the state's offer of proffer right then. It didn't need to even humor defendant by bringing any of these witnesses in, unless it, for some reason, thought the state was lying in saying that these subpoenaed defense witnesses had nothing to offer for defendant's case. And, of course, there was no indication or any reason for the state to be lying about that. At any rate, it could have ended there. They could have granted the motion in limine right there because, of course, these 10 subpoenaed witnesses had nothing to offer for defendant's support. They were all completely either irrelevant or harmed defendant's case. They either corroborated the victim and the accompanying nurse's testimony or they had nothing to offer irrelevant testimony. Either way, the motion in limine was properly granted, but that's not where defendant seems to bring that into the fray in his argument. That's not really the issue. The issue is defendant's right to self-represent himself and, with that in mind, he had no right to question these witnesses. The state didn't get to question them either at the motion in limine hearing. Trial court asked all the questions itself. So, at that point, that's not a denial of his right to self-representation. That was the trial court exercising its vast discretion in conducting its motion in limine hearing. Of course, you have to keep in mind that, presumably, the trial court knew how... had a pretty good idea how this trial was going to go. The cross-examination of the victim had already started before lunch. This was during the lunch break, the motion in limine hearing. The cross-examination had already started. Defendant, of course, asking either questions that are way beyond the scope of direct examination or asking irrelevant or asking and answering questions, repeating questions and so on. The cross-examination was taking unnecessarily long. The trial court presumably knew that this trial was going to last a lot longer than it should be. These people had already been sitting in the hallway for... These ten witnesses had already been sitting in the hallway for the half day already. Counsel, weren't a couple of those witnesses going to testify they didn't see a cup? One of the guards... Why wouldn't that be important? One of the guards... They didn't see, I guess, a cup, but one of the guards couldn't recollect. Again, neither could the other two, but they had both... The ones that couldn't see a cup or carton or whatever both testified that they saw the substance and smelled the substance all over the... all over the cell and the area in front of the cell. Again, this defendant didn't... Defendant wasn't offering these witnesses for that purpose. Defendant was offering these witnesses as some sort of conspiracy where the reason he got beat up, they're trying to create this framing. Again, these witnesses say, well, we saw the substance. We smelled the substance. How can that... That was irrelevant to defendant's point about being framed. And again, the trial court asked defendant point blank, what are these... Are these witnesses going to support your theory of defense? What are they going... How are they going to support it? And defendant said, well, I hope they testify. I hope they support it. He had no clue what these witnesses were going to testify to. This was, of course... Well, I doubt if he had an opportunity to interview them. Well, he chose to represent himself. Defense counsel could have, but he chose to represent himself. This was not a deposition. They would have been under an obligation to be interviewed by defense counsel? Well, if they had saw something that happened that was wrong, of course they would have been under an obligation, a duty to report anything they saw that happened wrongfully in this altercation. Again, this wasn't a deposition. This was a trial. This was not... And as the trial court noted, or state noted, this was nothing but a fishing expedition at the point that defendant was offering these witnesses. Again, just because defendant comes up with this theory and subpoenas these ten witnesses, that just doesn't automatically mean that they have to stay under subpoena. Again, the trial court could have just used the state's proffer. These witnesses have nothing to offer defendant. Granted the motion to eliminate then. It didn't. It listened to a couple of the witnesses. That's when the testimony came out about this. Did you see a milk carton or an orange juice carton or whatever? Of course, we know after trial that those two cartons look identical. I guess they're just a different color. But that's beyond... We're looking at the trees instead of the forest here. What about the multiple objections the court made itself during the trial in front of the jury? That's the second argument. And that's not a right to self-representation argument. Therefore, we can't follow the structural error, red herring, with that as far as forfeiture goes. Again, of course, both of these are forfeited. There was nothing in the post-trial motion. I don't think defendant even filed a post-trial motion. Again, it's well settled that he doesn't get special breaks because he represented himself. As far... There were numerous interjections by the trial court. Again, the... I think he said 37. I don't... The number really isn't important. The language of the trial court's interjections is important. First, like I said, forfeited. And if we include harmless error analysis, which Kleiner and Anderson both cited in my brief, if we use harmless error analysis, of course there was overwhelming evidence here. This was an open and shut case. The victim and the accompanying nurse both testified that defendant, indeed, threw the substance on the guard. And the jury also... Defendant claims that there was not damage to the uniform. The jury saw the uniform, so... Was it the trial judge's job to make sure the state doesn't look bad? It was not its job to make sure the state looked bad, but it's also... Is that how the court explained why it did what it did? Well, that was one of their justifications, so the state doesn't look like a bully because, again, the courtroom procedure of defendant was obviously not up to snuff. He kept asking improper questions in improper forms. But the trial court... I think the primary objective here is to control its own courtroom. It seemed to me that some of the objections the court made were not proper objections. For example, she said that was asked and answered. Well, he never got to ask that question on cross-examination. Are you talking about the exchange with the officer? Those and others. I mean, where the court says that was asked and answered on direct, how is that an appropriate objection when he is asking questions on cross? That... I can't...I don't know exactly which exchange you're speaking of, but if you are speaking of the one that I'm thinking of, Officer Poonke... That was about the nurse, which the defendant had been asking questions about that nurse already in his cross-examination, if I recall. And the Dr Tilden, the doctor where the defendant explained that nothing had been asked about Dr Tilden yet, she said asked and answered. Again, it wasn't because that doctor didn't treat the officer. It was a different doctor. I do think the trial court was confused in that exchange because it was a different doctor that the... Cooper said he was trying to... And I'm looking at page 30 of the appellant's brief. Oh, OK. Cooper says, I'm asking him, did he write it in his report? And the court says it doesn't matter if it's in his report. Cooper's trying to impeach the witness, so why wouldn't it matter if it was in his report or not? Again, reading this in context, it's about him turning... He's trying to say because the contraband officer or whatever they call him, he accidentally threw the defendant's name tag away. So this is what defendant pounced on, this is what defendant clung to that, well, they're framing me, they're switching uniforms. He also said in the report they don't even mention that he turned his uniform in his evidence. It's not even mentioned. And his theory was he was being framed. The officer that took the uniform did testify. Right, but what I'm getting at is, doesn't the defendant have a chance to ask those questions? She cut him off from asking the questions. Again, I... The defendant would have the right to ask those questions if they were relevant and if they hadn't been asked already. Asked by who? By defendant. No, it was asked by the state in direct. The... All right, this is a different one. You're talking about your disciplinary reports, your incident reports. You state you turned in your uniform for evidence. I'm sorry. That's been gone over. No, we didn't. Asked and answered. The evidence is sitting right here. Move on to something else. I'm asking, did he write it in his report? It doesn't matter if it's in his report. He didn't write it in his report, but it's right here. That's what I'm asking him. Did he write it in his report? So then the trial court asked, what's the relevance of that question? I'm trying to prove that that's not his uniform. The uniform is not damaged. He's framing me. Again, Officer Punk never testified to anything like that, that this wasn't his uniform. He testified specifically it was his uniform. So does the defendant, as a self-represented litigant, just have to accept everything the officer testified to and not get to ask about it? Of course not. Of course not. Again, I think that the overall number of interjections here is high, and maybe the trial court was frustrated with defendants representing himself. However, the way the interjections, the way they were phrased, were neutral by the trial court. Right after that, when they say it's all argument, it's not before the court, there's no evidence to that effect, that's because defendant's trying to twist that officer's words into saying that he was framing him or something like that. That clearly was argument by defendant. So it's important to clarify to the jury that this officer is not testifying to that line of facts. But more importantly, as Anderson also stated, besides the forfeiture, besides harmless error, the Anderson court, the trial court, and that instructed the jury, neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be. I quote that because the exact same instruction was used in this case. Is that IPI? I don't think so. Let me check. It must be, or a variation of such, because it was the exact same language in both cases. But at any rate... So any error the court may have made would have been cured by that instruction? Well, any error that showed, reflected an opinion or might have reflected an opinion to the jury, which as Justice Pope pointed out, the most egregious ones might have shown an opinion or something, might have indicated an opinion to the jury, a jury is presumed to follow the jury instructions. There's no record in this case, there's no indication in this case that they didn't. Here, that should cure any opinion that came through in the interjections. And also from a policy perspective, as I mentioned in my brief, there's basically three possibilities. All of them benefit defendant, none of them hurt defendant in the future if we take defendant's theory as a holding here. Defense counsel or defendant ask multiple questions, three things can happen. The state looks like a bully for objecting so many times, after I guess it would be 37 possible objections in this trial. Although I think many times the defendant was asking questions beyond the scope of direct examinations that would let go. The state looks like a bully for objecting so many times, too. The trial court interjects, like they did in this case. There's a clear avenue on appeal for bias or hostility or whatever argument that can be. Or three, the state and the trial court do nothing, allow the jury to be influenced by this in-planning of a theory of framing or whatever it would be. These questions where there's nothing beyond the scope of cross-examination or beyond any relevance of the evidence that the witnesses had. There would be no downside to doing that. There would really be an encouragement for defense counsel to ask as many and the more improper questions, the better. Not just pro se defendants, but even defense counsel. Of course, that can't stand and is against, obviously, proper courtroom procedure. Clearly, the main thing here is that both of these arguments are forfeited. There was no post-trial motion. The structural error, like I said, is a red herring, and the trial court's conduct is also a red herring. People versus Kleiner said, well, if the trial court's conduct involved, then forfeiture rules are relaxed. However, the factual scenario in Kleiner was that the jury asked questions to the trial court, the trial court answered them or disposed of them without telling defense counsel. Of course, defense counsel has no opportunity to object. He didn't even know about the questions. Here, obviously, the defendant was on the other end of all these interjections, and he was on the other end of this motion to eliminate hearing. Clearly, he had every opportunity and every reason to file a post-trial motion and to bring these up, and in that case, we would have a clear record of why the trial court performed the way they did. However, they didn't, so clearly these are forfeited issues, and, of course, the evidence against the defendant was overwhelming, so plain error analysis shouldn't apply either. If the trial court has no more questions, I'd ask the court to affirm. I don't see anything. Thank you, Mr. McNeil. Thank you. Mr. Nielsen, rebuttal? Yes. The state began its argument by noting People v. Owen regarding the case that said that the court can control the way an offer of proof is handled, and that is correct. But in this case, one, the court didn't have to take the state's word on what the witnesses would testify about. In fact, there's no evidence that the state knew why the defendant wanted those witnesses to testify, and Justice Turner, as you pointed out, none of the three first responders to what was a crime scene, Mr. Cooper Sell, reported in their written report seeing a milk carton, seeing the most tangible piece of evidence that would have helped the state's case. They didn't report seeing that. Two of the three testified that they did smell something and see a liquid substance outside of the cell, but nobody thought to ask them, is that unusual? I mean, this is a prison, after all. Is this unusual that you would smell these things or see these things outside of a cell? If those things existed, you would have thought that they would have put them in their written reports, but they didn't. That is one of the prime reasons why the court's failure to allow Jeremy to examine these witnesses during the offer of proof and the court's further failure to allow him to argue why the testimony elicited during the offer of proof was helpful to his case after the offer of proof concluded was prejudicial to his case. The court had told him during examination of one of the witnesses, this isn't your time to argue, you'll have a chance to argue. The court examines the three witnesses. Jeremy tries to argue why their testimony is admissible, and the judge says, this isn't your time to argue, this is my ruling. This is not a judge who is giving a defendant, represented or not, the rights that he is entitled to. And as Ellison, and if we want to go back to Feretta, when it talks about the right to self-representation, that was denied in this case where the judge stepped in and commandeered this offer of proof that didn't allow the defendant to explain why this testimony was essential to his defense. This is structural error. In the briefs, we have cases that we have cited to, for both of these examples, the state is right, the issues in this case were raised as two separate issues, the offer of proof issue and the frequent interjections by the trial court. But in the briefs, there's precedent for both of those factors being structural error. And in this case, again, it satisfies at least the second prong of the plain error analysis, where there's a precedent that there's been a fundamental right that the defendant wasn't afforded, regardless of the closeness of the evidence. Again, I'd very much like to stand up here and tell you that the evidence was closely balanced in this case, but I can't do that because of the court's conduct in excluding the evidence that Jeremy would have admitted, which would have shown that the evidence was closely balanced here. It is plain error under the second prong of the plain error analysis and it is structural error. And it is a situation where the failure of Jeremy to include these in a post-trial motion needs to be forgiven because this, after all, was the judge's conduct. And there's evidence in the record, based on the comments that the court made after the jury left to deliberate, that indicate the judge wasn't going to change its mind. The judge had no regrets about the statements that it made to the jury, the comments that it made, the objections that it made. A post-trial motion would not have done anything to change the court's mind here, and that's the primary reason for filing the post-trial motion. The state offers three different examples of what could have happened in this case had the court not done what it did. It would force the state to object, which makes the state look like a bully. The court interjects like it did here, or the parties do nothing. You only have those three avenues. One, the state necessarily wouldn't have looked like a bully because hopefully it just would have objected to objectionable questions. Many of the objections that the court made were to testimony that wasn't objectionable to begin with. And again, this is how our adversarial process works. Sometimes it is messy for people to get a fair trial, but the state and the defense have their defined roles. Those roles weren't followed in this case. So in conclusion... How about the jury instruction? It goes back to the point that you made, Justice Turner, regarding the jury instruction, that especially in an area like this where the courts have said that juries are quick to seize upon the leanings of a judge. I guess my question would be, what instruction does the judge want the jury to follow? Does it want the jury to follow the instruction that it gives at the time that it sustains the objection or at the time it explains why an objection was sustained or when it tells Jeremy to move on? Or does it want the jury to listen to the jury instruction that's given saying, pay no attention to what I've said before? It's got to be one or the other. It can't be both. They're mutually exclusive. So at the very least, it would have confused the jury. And at the very most, by the time the instruction is given, it was too late to already correct the damage that had been done by the trial court's leanings. So we would ask that Jeremy Cooper's case be reversed and remanded for a new trial. Thank you, Your Honor. This matter will be taken under advisement. The court will be in recess until the next case.